IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-cr-12 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |
| FREDERICK HILL, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion to Suppress Evidence seized from a search of Defendant Frederick Hill's vehicle after an alert by a K-9 during a traffic stop (Doc. 21).[1] The United States opposes the Motion. (Doc. 22.) On March 9, 2021, the Court held a hearing on Defendant's Motion. For the reasons that follow, Defendant's Motion will be **DENIED**.

I. BACKGROUND

A. Facts

At the March 9, 2021 hearing, the Government called two witnesses, Officer Brandon Ramirez and Officer Mike Doughman, to testify to the facts surrounding a traffic stop of the Defendant's vehicle on October 24, 2019.[2]

The first witness, Officer Brandon Ramirez, is the Middletown, Ohio police officer who initiated a traffic stop of Defendant's vehicle. Officer Ramirez was an officer with the Middletown, Ohio Police Department from 2010 until 2020. He has since changed forces and is

---

[1] The Court addresses Defendant's Motion to Suppress and for *Franks* Hearing (Doc. 48) by separate Order as it arises from a different set of facts.
[2] The traffic stop was captured by Officer Ramirez's police cruiser's dash camera, which was entered into evidence as Government Exhibit 1. The video has no audio.

1

employed as a police officer in Sunberry, Ohio. Prior to graduating from the police academy, he was employed as security forces in the United States Air Force on bases in Korea and Texas.

In the early morning of October 24, 2019, Officer Ramirez was running radar for speed enforcement in Middletown, Ohio. He observed Defendant Frederick Hill driving a Dodge Charger northbound on Verity Parkway in Middletown, Ohio. Because Officer Ramirez heard Defendant rev his engine and observed his car going 50 miles per hour in a 25-mile-per-hour zone, he commenced a stop of Defendant's vehicle.

Officer Ramirez pulled behind Defendant's Dodge Charger, activated his lights, and signaled for Defendant to pull over. Defendant complied by pulling into a parking lot on Verity Parkway. Officer Ramirez approached the driver's side of the Defendant's gray Dodge Charger. (Gov. Ex. 1 at 1:00.) Using a flashlight, Officer Ramirez requested Defendant's license and registration. He observed that Defendant was not wearing his seatbelt. He also noticed the Defendant avoided making eye contact with him and that Defendant's breathing changed, such that his chest was moving and he had an elevated breathing rate. In Officer Ramirez's experience, individuals who avoid making eye contact and engage in nervous behavior possibly are in possession of narcotics or weapons or have a warrant out for them.

Defendant asked for permission to retrieve his identification from his back pocket, to which Officer Ramirez agreed. Defendant was very cooperative and handed over his license. Officer Ramirez began walking back to his cruiser with Defendant's license in hand. (*Id.* at 1:26.) Officer Ramirez recognized the Defendant's name on his license. He recalled a fellow police officer who worked the same shift as him recently told him he stopped a Freddy Hill and discovered a gun in his vehicle.

Upon returning to his cruiser, Officer Ramirez requested dispatch send an additional police officer as well as a K-9 to conduct a free air sniff around Defendant's vehicle. No K-9 was available in Middletown, Ohio, so Officer Ramirez requested support from the nearby jurisdiction of Monroe, Ohio. Office Ramirez testified that he requested assistance because he was familiar with Defendant's name and needed assistance to do overwatch of the vehicle and provide backup. Officer Ramirez also ran Defendant's information from his license and registration through the "CAD" system with dispatch and began preparing a handwritten traffic ticket.

About nine minutes later, Officer Ramirez returned to the Defendant's driver's side window and briefly interacted with the Defendant at that time. (*Id.* at 10:36.) He does not recall what the discussion was about, but it is possible he asked for consent to search his vehicle. After that interaction, Officer Porter arrived to the scene to assist, at which time Officer Ramirez briefed Officer Porter on the situation.

About seven and a half minutes after Officer Porter's arrival, Officer Ramirez approached Defendant's vehicle to ask Defendant if he had any weapons and if he would consent to a pat down. (*Id.* at 18:55.) Around this time, Officer Doughman with the Monroe, Ohio Police Department arrived to the scene with his K-9 partner, Helix. Officer Doughman testified that he works on canine patrol and is trained as a canine unit officer. He and Helix have completed certifications in narcotics, including detecting marijuana.[3]

Officer Ramirez conducted a pat down, and then asked Defendant to step away from the vehicle to allow a free-air canine sniff of the vehicle. Officer Doughman then approached Hill's

---

[3] The Government entered Exhibits 3 and 4, which are Officer Doughman and Helix's Certifications in "Patrol Related Canine Unit Evaluation" and "Special Purpose Canine Unit Evaluation" respectively, both with certifications running from December 19, 2018 through December 27, 2019. The Certifications were issued by the Office of the Attorney General of Ohio.

3

vehicle with Helix. (*Id.* at 19:54.) Helix alerted on the vehicle during the sniff multiple times, the first of which was on the passenger side (*Id.* at 20:05). Immediately after the sniff, Officer Ramirez testified that he opened the door for Hill to turn off his cell phone in the vehicle because it was a noise distraction to the vicinity. After that, Officer Ramirez searched the driver's compartment of the vehicle while Officer Doughman searched the front passenger area.

Officer Ramirez retrieved a loaded firearm from the vehicle, and Officer Doughman located marijuana shake, or residue, on the passenger side floorboard and carpet. Hill was arrested. (*Id.* at 22:32.) A gun and ammunition were placed in an envelope.[4] Hill was booked and charged with speeding, a seatbelt violation, possessing weapons under disability, and improper handling of a loaded firearm in a motor vehicle.

The beginning of the traffic stop until the point of the K-9 search was approximately nineteen minutes. When questioned about whether there was any idle time spent merely waiting for the K-9, Officer Ramirez responded that there was "very, very minimal, if any" idle time waiting for the K-9. In Office Ramirez's experience, it typically takes between twelve to twenty minutes from the minute he pulls someone over until a traffic ticket is written. Officer Ramirez testified that he did nothing to deliberately prolong the stop with the Defendant.

**B. Procedural History**

On February 6, 2020, Defendant was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 14.) On May 7, 2020, Defendant filed a Motion to Suppress evidence, which is the Motion this Order addresses. (Doc. 21.) On May 22, 2020, the Government responded in opposition. (Doc. 22.)

---

[4] Government Exhibit 2, a photograph of the weapon retrieved from Hill's vehicle, was admitted into evidence.

4

On June 3, 2020, a Superseding Indictment charged the Defendant with four counts of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and one count of possession with intent to distribute 40 or more grams of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (Doc. 23.) Count 2 arises from the October 24, 2019 traffic stop at issue (Doc. 21). The three new charges arise from search warrants which authorized the search of two residences. On January 1, 2021, Defendant filed a new Motion to Suppress and for *Franks* Hearing (Doc. 48) relating to the new charges, which the Court addresses by separate Order. On March 9, 2021, the Court held a hearing and took both Motions under advisement.

Defendant argues that the warrantless search of his vehicle violates the Fourth Amendment. He asserts three main arguments in support of suppression of the evidence seized from his vehicle: (1) the initial stop of his vehicle was not supported by probable cause; (2) his detention was prolonged beyond that which is necessary to effectuate the purpose of the stop, and no reasonable suspicion supported prolonging the stop; and (3) Helix's positive alert to Hill's vehicle is unreliable. For the reasons that follow, the Defendant's Motion to Suppress will be **DENIED**.

## II.    LAW

"The Fourth Amendment safeguards '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015) (citing U.S. Const. amend. IV). "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)). Whether a stop passes constitutional muster is analyzed under the temporary detention standard set forth in *Terry v.*

5

*Ohio*, 392 U.S. 1 (1968), and its progeny. *Id.* at 295–96 (citing *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010)). Under this framework, the stop must be both (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 296 (citing *Terry*, 392 U.S. at 20). "If an officer develops reasonable and articulable suspicion of criminal activity during a stop, 'he may extend [the] traffic stop long enough to confirm or dispel his suspicions. Any such extension, though, must be limited in scope and duration.'" *Id.* (internal citations removed) (citing *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012)).

### III. ANALYSIS

#### A. Initial Stop

It is well-established that where an officer has probable cause to believe a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment. *Winters*, 782 F.3d at 296 (initial stop of vehicle justified where the officer witnessed the vehicle speeding and had probable cause to believe a traffic violation was occurring). Officer Ramirez testified that he observed Defendant driving fifty miles per hour in a twenty-five-mile-per-hour zone, which gave him probable cause to believe a traffic violation was occurring. Thus, the initial traffic stop was justified.

#### B. Whether the Stop was Prolonged by the K-9 Drug Sniff

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Id.* at 297 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Under the second step of the *Terry* framework, a traffic stop 'must ... last no longer than is necessary to effectuate the purpose of the stop,' and 'the investigative methods employed should be the least intrusive means reasonably

available to verify or dispel the officer's suspicion in a short period of time.'" *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "Once the original purpose of the traffic stop—here, investigating a speeding violation—has been completed, the occupants 'cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.'" *Id.* (citing *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)). In determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

The use of a trained narcotics dog during a lawful traffic stop "generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409. However, an officer may not prolong a traffic stop for the purpose of conducting a drug sniff, a crime-detecting action not typically incident to a traffic stop, without independent reasonable suspicion to detain the motorist. *Rodriguez*, 575 U.S. at 350. In *Rodriguez*, the Supreme Court rejected the argument that prolonging a traffic stop for the purpose of a drug sniff was *de minimus* and remanded the case back to the Eight Circuit Court of Appeals on the question of whether reasonable suspicion supported the extended stop for the purpose of conducting a drug sniff. *Id.* at 357–58.

Although the drug sniff in *Rodriguez* occurred *after* a traffic ticket was written, the Court pointed out that authority for a seizure does not hinge on when a traffic ticket is written but rather if the traffic stop is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation. *Id.* at 350–51. "'Authority for the seizure thus ends when tasks tied to the traffic infraction are–or reasonably should have been–completed;' whichever comes first." *United States v. Lott*, 954 F.3d 919, 923–24 (6th Cir. April 1, 2020)

(citing *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 354)). Aside from determining whether to issue a traffic ticket, the officer's mission includes ordinary inquiries incident to the traffic stop, like checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez,* 575 U.S. at 355. "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. Thus, as to a dog sniff, "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket ... but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id.* at 357.

Recently, this court determined a traffic stop was not unnecessarily prolonged for twelve to thirteen minutes to conduct a drug sniff in *United States v. Windston-Stroud*, No. 3:19-cr-179, 2020 WL 2512851, at *6 (S.D. Ohio May 15, 2020) (J. Rose). In that case, the defendant was pulled over for illegal window tint. *Id.* at *2. The officers called a K-9 to the scene due to the driver's drug and gun history, with approximately twelve to thirteen minutes elapsing between the time the officers initiated the traffic stop and the drug sniff. *Id.* Officers discovered during the stop that the defendant was on parole. *Id.* The Court determined that the dog sniff did not prolong the seizure and the defendant did not offer evidence to counter the conclusion. *Id.* at *6.

Similarly, in *United States v. Lott*, the Sixth Circuit affirmed the district court's denial of the defendant's suppression motion where a defendant who was pulled over for a roadside violation challenged the duration of the stop. 954 F.3d at 923. Similar to the case at bar, the defendant was extremely nervous in interacting with the trooper who pulled him over. *Id.* at 921. The trooper conveyed he was not going to issue a traffic citation but returned to his police vehicle to run the driver's license through his computer system for outstanding warrants. *Id.*

8

The trooper then returned to the defendant's vehicle to question him while a warrant search was running in his patrol car, the last of the tasks to complete the traffic stop. *Id.* at 924. During that questioning, defendant admitted to possessing marijuana. *Id.* There was no evidence the trooper delayed his return to the patrol car beyond the time search results may have been returned. *Id.* at 925. The record also lacked a timeline for when the trooper should have expected the results of the warrant search to return. *Id.* "The record therefore provides no basis for concluding that the warrant search had finished by the time [defendant] admitted to possessing marijuana." *Id.* Viewing the facts in light most favorable to the government, the standard on review of a district court's denial of a suppression motion, it was not clear error for the district court to find that the marijuana admission occurred within the temporal scope of the tasks incident to the initial traffic stop. *Id.*

In this case, the Defendant was detained for approximately nineteen minutes before the K-9 alerted during the drug sniff, which is within the range of time Officer Ramirez testified a typical traffic stop takes. He testified he did nothing to prolong the stop and was completing tasks incident to the traffic stop while waiting for the K-9 unit to arrive. According to Officer Ramirez, those tasks included obtaining driver's license and registration, speaking with the Defendant, requesting backup and a K-9 unit, running Defendant's information through the "CAD" system with dispatch, briefing Officer Porter when he arrived to the scene, and writing up the ticket, which included two different violations. There is no evidence that those tasks were completed prior to Helix's alert on the vehicle.

The Court found Officer Ramirez to be a credible witness. Defendant did not elicit any testimony that the stop was purposefully prolonged to conduct the K-9 sniff or that the stop took an unreasonable amount of time. It is unknown when the traffic ticket was completed or

9

reasonably should have been completed. The traffic ticket and "CAD" logs were not entered into evidence. However, the duration of the stop until the K-9 alerted during the drug sniff was within the range of time Officer Ramirez testified a typical traffic stop takes. On this record, the Court finds that the stop was not unnecessarily prolonged. Accordingly, the Court finds no Fourth Amendment violation.[5]

### C. Alert by a Trained and Certified Drug-Detection Canine

The law is well-established that an alert by a properly trained narcotics dog while sniffing a vehicle is sufficient to establish probable cause for a search of the vehicle. *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994). In *Florida v. Harris*, 568 U.S. 237, 246-47 (2013), the Supreme Court set forth the standard for determining that a narcotics dog has been properly trained:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

Officer Doughman testified that he and Helix were certified in narcotics recognition at the time the traffic stop occurred. Those Certifications were issued by the Office of the Attorney General of Ohio and current at the time of Helix's alert on the Defendant's vehicle. As Helix is a properly trained narcotics dog, the search of Defendant's car based upon Helix's alert was lawful and did not violate the Fourth Amendment.

---

[5] Because the Court finds the stop was not unnecessarily prolonged and probable cause was established when Helix alerted, it need not address the issue of reasonable suspicion.

## IV. CONCLUSION

For the reasons set forth herein, the Defendant's Motion to Suppress (Doc. 21) is

**DENIED.**

**IT IS SO ORDERED.**

*Susan J. Dlott*
Judge Susan J. Dlott
United States District Court