IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-cr-12 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND FOR *FRANKS* HEARING** |
| FREDERICK HILL, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion to Suppress Evidence and for *Franks* Hearing regarding evidence seized pursuant to two search warrants (Doc. 48). The United States opposes the Motion. (Doc. 51.) For the reasons that follow, Defendant's Motion will be **DENIED**.

I. **BACKGROUND**

On February 10, 2020, Magistrate Judge Stephanie K. Bowman issued two Search and Seizure Warrants, one authorizing the search of 803 10th Avenue, Middletown, Ohio 45044, and the other authorizing a search of 1017 Garden Avenue, Middletown, Ohio 45044. (Docs. 51-1; 51-2.) Both Search Warrants were supported by the same Affidavit in Support of Applications for Search Warrants by Special Agent Matthew F. Wenker dated January 27, 2020. (Doc. 51-1 at PageID 177–192; Doc. 51-2 at PageID 210–225.) Defendant's pending Motion seeks to suppress the evidence discovered in executing the Search Warrants.

A. **Search Warrant Affidavit**

Agent Wenker has been employed as a Special Agent with the Federal Bureau of Investigation (FBI) since 2011. (Affidavit, ¶ 1.) He is experienced in investigating criminal enterprises, organized crime, and violent crime and has specialized training in unlawful drug

1

trafficking. (*Id.* at ¶¶ 1–5.) He has conducted criminal enterprise investigations involving use of confidential informants, surveillances, and execution of search warrants. (*Id.*) Based on his training and experience, he is aware that drug traffickers often communicate with customers, couriers, and associates through telephones and devices. (*Id.* at ¶ 5.)

In January 2019, FBI Cincinnati, Middletown Police Department (MPD), Special Operations Unit (SOU), Butler County Undercover Regional Narcotics Unit (BURN), and Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Cincinnati initiated a multi-agency joint investigation into the All State Violent Criminal Organization (VCO) based in Middletown, Ohio. (*Id.* at ¶ 7.)

The investigation into the All State VCO throughout 2019 resulted in a federal conspiracy indictment of 400 grams or more of fentanyl mixture of 13 members of the All State VCO, numerous federal gun charges, and over a dozen individuals on state criminal charges related to their involvement with the organization. (*Id.* at ¶ 9.) Through All State VCO post-arrest interviews, confidential informant debriefings, and other sources of information, investigators became aware of a major heroin and fentanyl drug trafficking cell led by Defendant Frederick Hill that partnered with the All State VCO. (*Id.* at ¶ 10.)

At the time of the Affidavit, Hill was a fugitive with an active arrest warrant out of Texas related to drug trafficking. (*Id.* at ¶ 11.) His criminal history includes: felony arrests for aggravated robbery and carrying a concealed weapon in 2000, carrying a concealed weapon, weapons under disability, assault on a police officer, and possession of cocaine in 2001; carrying a concealed weapon, weapons under disability, possession of marijuana, and felonious assault in 2004; failure to comply with the order of police, felonious assault, and having weapons under disability in 2005; federal possession with intent to distribute over 500 grams of cocaine

2

hydrochloride (resulting in an 84 month federal prison sentence) in 2011; and having weapons while under disability and carrying concealed weapons on two separate occasions in 2019. (*Id.*) Hill is on State of Ohio bond related to the second 2019 felony arrest for having weapons while under disability and carrying concealed weapons felony charges. (*Id.*) At the time of the Affidavit, Hill was serving a 60-month federal supervised released program. (*Id.*)

In July 2001, Hill was convicted of assault on a police officer and incarcerated for 12 months. (*Id.* at ¶12.) Based on that felony conviction, Hill is prohibited by federal and Ohio law from possessing a firearm. (*Id.*)

Based on an investigation, Hill was believed to be a primary supplier of heroin and fentanyl throughout Middletown, Ohio and was operating from two residences, 803 10th Avenue, Middletown Ohio 45044 ("Target Residence 1") and 1017 Garden Avenue, Middletown, Ohio 45044 ("Target Residence 2"). (*Id.* at ¶ 13.) The Affidavit includes summaries of information conveyed by twelve Cooperating Defendants ("CDs"), not all of which are detailed in this Order.

On or about July 18, 2019, a joint multi-agency law enforcement undercover operation resulted in the arrest of two individuals attempting to deliver a kilogram of heroin and fentanyl mixture to an undercover law enforcement officer for $44,000 cash. (*Id.* at ¶ 15.) CD-2 provided that he/she had met with Hill multiple times on July 18, 2019 to attempt secure large quantities of heroin and fentanyl mixture to piecemeal together the kilogram for the sale. (*Id.*) Hill allegedly said he would not provide the heroin and fentanyl because the details of the drug transaction did not sit right with him. (*Id.*) Surveillance of the subjects on July 18, 2019 confirmed the meetings with Hill. (*Id.*)

3

### 1. Target Residence 1

On December 16, 2019, CD-11 provided that Hill is selling large quantities of heroin and fentanyl mixture in Middletown and Hamilton, Ohio. (*Id.* at ¶ 26.) CD-11 had previously purchased heroin and fentanyl mixture from Hill numerous times, and provided specific details about Hill and his operations, such as visiting Hill at Target Residence 1 to purchase heroin and fentanyl mixture. (*Id.*) A search of CD-11's telephone revealed the contact "Fred" with the known phone number of Hill listed. (*Id.*)

On January 6, 2020, [X[1]] was arrested pursuant to a traffic stop and found to be in possession of 100 grams of heroin and fentanyl mixture and cash. (*Id.* at ¶ 27.) A post-arrest interview with CD-12 revealed narcotics were acquired from [X[2]]. (*Id.*) Law enforcement believes the narcotics from [X[3]] were sourced from Hill. (*Id.*) CD-12 further described having previously purchased heroin and fentanyl mixture directly from Hill multiple times, and a search of CD-12's telephone revealed the known telephone number of Hill saved under the name "Fred." (*Id.*) Text message conversations between CD-12 and Hill showed Hill directing CD-12 to "meet me in the alley behind my spot on the 10th" (Target Residence 1). (*Id.*)

### 2. Target Residence 2

On May 7, 2019, CD-1 was interviewed by Drug Enforcement Agency ("DEA") New Jersey after being arrested while attempting to deliver five kilograms of heroin and fentanyl mixture to a customer in New Jersey. (*Id.* at ¶ 14.) CD-1 provided that he/she was involved in transporting narcotics and bulk cash for a Mexico-based Drug Trafficking Organization (DTO), and that one of their main customers was Hill in Middletown, Ohio. (*Id.*) CD-1 described

---

[1] Name redacted.
[2] Name redacted.
[3] Name redacted.

overseeing numerous shipments of three to four-kilogram quantities of heroin and fentanyl mixture concealed within semi-truck loads coming from California and Arizona which were delivered to Hill. (*Id.*) On one specific occasion, CD-1 personally delivered three kilograms of heroin and fentanyl mixture to Hill on April 6, 2019 at Target Residence 2. (*Id.*) CD-1 described observing Hill conceal narcotics in the laundry room of Target Residence 2. (*Id.*) Toll analysis of Hill's known telephone number showed him in communication with multiple international +52 Mexico telephone numbers which appeared to corroborate the information provided by CD-1. (*Id.*)

On December 15, 2019, an inmate at Butler County Jail who was arrested as part of the All State VCO conspiracy indictment placed a recorded jail call to Hill on his known telephone number. (*Id.* at ¶ 25.) Hill directed the inmate to send a letter to him at Target Residence 2 and stated, "I get everything that come there." (*Id.*) During the call, Hill also talked about William Wofford and [A[4]] who were involved in a drug trafficking operation and the underlying investigation. (*Id.*)

From October 29 through December 7, 2019, Middletown Police Department had a state court authorized telephone GPS ping location on Hill's known telephone number and a court authorized GPS tracker on one of his vehicles. (*Id.* at ¶ 29.) The GPS location data showed Hill residing overnight at Target Residence 1 and frequently visiting Target Residence 2. (*Id.*)

From October 2019 through January 27, 2020, routine physical and video surveillance of Hill showed Hill residing overnight at Target Residence 1 while frequently visiting Target Residence 2. (*Id.* at ¶ 30.) Hill resides with his paramour, Kisha Aldridge, at Target Residence

---

[4] Name redacted

5

1. (*Id.*) Hill's mother, Dana Hill, occupies Target Residence 2. (*Id.*) The surveillance also showed both Aldridge and Dana Hill operating and utilizing Hill's multiple vehicles. (*Id.*)

On January 17, 2020, investigators received information that Hill and Aldridge were both sending international financial payments to individuals in Mexico. (*Id.* at ¶ 31.) Based upon the affiant's training and investigation, the payments were believed to be related to drug trafficking. (*Id.*)

On January 23, 2020, investigators reviewed recent electronic surveillance of Target Residence 1 and 2, which confirmed Hill was living at Target Residence 1. (*Id.* at ¶ 32.) Hill has five vehicles and drove different vehicles at different times. (*Id.*) Hill was observed meeting with individuals in front of Target Residence 1 and conducting long telephone conversations by himself in his vehicles. (*Id.*) On January 6, 2020, at 4:30 p.m., several Hispanic males appeared to carry black garbage bags with unknown content into Target Residence 1. (*Id.*) Hill visited Target Residence 2 on an almost daily basis in different vehicles, going in and out for brief periods, consistent with retrieving items from the residence. (*Id.*)

Hill also was observed wearing expensive clothing and jewelry, despite investigators' inability to identify Hill's source of employment. (*Id.* at ¶ 33.) Based upon training and experience, Hill has significant unexplained wealth, and his possessions appear to be purchased with drug proceeds. (*Id.*)

Agent Wenker attested that Hill engaged in a pattern of utilizing Target Residence 1 and Target Residence 2 to hide and conceal drug proceeds, personal assets purchased with drug proceeds, narcotics, firearms, and evidence of narcotics trafficking. (*Id.* at ¶ 34.) He swore based on his experience and training that large-scale drug traffickers frequently use residences for the purpose of storing narcotics, records of drug transactions, large amounts of currency,

6

financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and that residences often contain evidence of financial transactions or spending large sums of money from engaging in narcotics trafficking. (*Id.*) Based on this, Agent Wenker believed there was probable cause that Hill was engaged in drug trafficking and that he was using Target Residences 1 and 2 to conceal himself as a fugitive from law enforcement and to store and conceal evidence of drug trafficking. (*Id.* at ¶¶ 35–36.) On January 27, 2020, Magistrate Judge Stephanie K. Bowman authorized Search Warrants for Target Residences 1 and 2.

### B. Procedural History

On February 6, 2020, Defendant was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[5] (Doc. 14.) On June 3, 2020, a Superseding Indictment charged the Defendant with four counts of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and one count of possession with intent to distribute 40 or more grams of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (Doc. 23.) The three new charges arise from Search Warrants which authorized the search of Target Residences 1 and 2.

On January 20, 2021, Defendant filed a Motion to Suppress and for *Franks* Hearing (Doc. 48) relating to the new charges. On February 11, 2021, the Court found that the Defendant did not make the preliminary showing entitling him to an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (February 11, 2021 Minute Entry.) On March 2, 2021, Defendant filed a Motion for Reconsideration of that decision. (Doc. 52.) On March 9, 2021, the Court held a suppression hearing and denied the Motion for Reconsideration. (Doc. 53.)

---

[5] On May 7, 2020, Defendant filed a separate Motion to Suppress relating to the original charge, which involved a traffic stop. (Doc. 21.) As it arises from a different body of facts, the Court addresses this Motion by separate Order.

7

Thus, the only remaining issue to be decided is that of suppression. However, this Order also memorializes its prior *Franks* ruling. For the reasons that follow, the Defendant's Motion to Suppress and for *Franks* Hearing will be **DENIED**.

## II. LAW AND ANALYSIS

### A. Affidavit Provided Probable Cause to Search Target Residence 1 and Target Residence 2

Pursuant to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, ___ U.S. ___, ___, 138 S.Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. ___, ___, 134 S.Ct. 1090, 1103 (2014)). As the Sixth Circuit recently opined:

> Probable cause exists if the facts, circumstances, and "reasonably trustworthy information" would allow a person "of reasonable caution" to believe that a crime has been committed. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L.Ed. 1879 (1949). This is "a practical, nontechnical conception," *ibid.*, and it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

*United States v. Neuhard*, 770 F. App'x 251, 253 (6th Cir.), *cert. denied*, 140 S. Ct. 570 (2019).

In determining whether a search warrant is supported by probable cause, a court may consider only the "four corners of the affidavit." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009); *United States v. Ruffin*, 979 F.3d 528, 531–32 (6th Cir. 2020). Thus, "information known to the officer but not conveyed to the magistrate is irrelevant." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)).

8

Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Ruffin*, 979 F.3d at 531. Thus, "the affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). In determining whether this nexus exists, courts have concluded that "in the case of drug dealers, evidence is likely to be found where the dealer lives." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998).

An affiant may rely upon information supplied by a confidential informant so long as the information is adequately corroborated. "[A]n affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *United States v. Caldwell*, 114 F. App'x 178,181 (6th Cir. 2004) (citing *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004)). In assessing information provided by an anonymous informant, the Court considers the veracity, reliability, and basis of knowledge for that information as part of its totality-of-the-circumstances review. *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) (citing *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003)).

Two factors are often critical in determining whether a confidential informant's tip provides a "substantial basis" that a search warrant would uncover evidence of wrongdoing. *United States v. Sonagere,* 30 F.3d 51, 53 (6th Cir. 1994) (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983)). First, an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's] tip to greater weight than might otherwise be the case." *Id.* (citing *Gates* at 234). "Second, the extent to which the tip

9

is corroborated by the officers' own investigation is significant." *Id.* (citing *Gates* at 244). In this case, both factors are met.

Agents have demonstrated sufficient reliability of the key informants' tips in this case when considered under the totality-of-the-circumstances standard. As to Defendant's drug trafficking generally, for instance, CD-2 described a first-hand meeting with Hill on July 18, 2019 to attempt to secure large quantities of heroin and fentanyl, although the sale did not come to fruition. (Affidavit at ¶ 2.) Surveillance of the subjects on July 18, 2019 corroborated the meetings with Hill, giving the tip reliability. (*Id.*)

As to Target Residence 1, the tips from both CD-11 and CD-12 were personal accounts of observing and participating in criminal activity at Target Residence 1. The tips were reasonably corroborated through toll analysis and subsequent police surveillance of the residence to demonstrate sufficient reliability. CD-11 provided that he/she had previously purchased heroin and fentanyl mixture from Hill and his operations such as visiting Hill at Target Residence 1 to purchase heroin and fentanyl mixture. (*Id.* at ¶ 26.) Agents attempted to corroborate the information by searching CD-11's telephone, which revealed the contact "Fred" with Hill's telephone number listed. (*Id.*) CD-12 described previously purchasing heroin and fentanyl from Hill, and a search of CD-12's telephone revealed Hill's known telephone number along with text messages directing CD-12 to "meet me in the alley behind my spot on 10th", a reference to Target Residence 1. (*Id.* at ¶ 27.)

As to Target Residence 2, CD-1 described a firsthand account of observing and participating in criminal activity at Target Residence 2, as he/she informed the DEA that he/she was involved in transporting narcotics to Target Residence 2 and personally observed the

10

Defendant conceal narcotics in the laundry area of Target Residence 2. (*Id.* at ¶14.) Toll analysis between the Defendant and CD-1 corroborated communication between the two. (*Id.*)

Further, all tips were corroborated through detailed and extensive surveillance efforts of Hill's activities at Target Residences 1 and 2. From October 29 through December 7, 2019, court authorized telephone GPS ping location data and a GPS tracker on one of Hill's vehicles showed Hill residing overnight at Target Residence 1, while frequently visiting Target Residence 2. (*Id.* at ¶ 29.) Routine physical and video surveillance also revealed Hill residing overnight at Target Residence 1, while frequently visiting Target Residence 2. (*Id.* at ¶ 30.) On January 23, 2020, investigators reviewed recent electronic surveillance footage of Target Residence 1 and Target Residence 2. (*Id.* at ¶ 32.) Hill has five known vehicles and drove the vehicles at different times. (*Id.*) He has been observed meeting with unknown individuals in front of Target Residence 1 and often sat in one of his vehicles to conduct lengthy telephone conversations alone. (*Id.*) On or about January 6, 2020, at around 4:30 p.m., several Hispanic males appeared to carry black garbage bags with unknown content into Target Residence 1, potentially corroborating ties to the Mexican cartel. (*Id.*) Hill visited Target Residence 2 on an almost daily basis in different vehicles, usually going in and out of the residence for brief periods of time in a manner that would be consistent with retrieving items from the residence. (*Id.*) Here, under the totality of the circumstances, the tips relied upon for establishing probable cause are sufficiently corroborated.[6]

Defendant also argues there is insufficient nexus between his residences and drug activity, as there were no controlled buys from either residence. Evidence of controlled buys is

---

[6] Agent Wenker referenced a dozen confidential informants' tips in his Affidavit. They too were reasonably corroborated by police surveillance. But even if that were not sufficient to demonstrate corroboration, those informants were not necessary to the probable cause finding here, and they could be disregarded without affecting the outcome of this ruling.

11

not the only means used to establish probable cause in searching an alleged drug trafficker's residence. "[I]n the case of drug dealers, evidence is likely to be found where the dealers live." *Jones*, 159 F.3d at 975 (internal quotation omitted). The Sixth Circuit recently summarized:

> "[A]n affidavit containing credible, verified allegations of drug trafficking, verification that said defendant lives at a particular residence, combined with the affiant officer's experience that drug dealers keep evidence of dealing at their residence," can be sufficient to demonstrate a nexus between the criminal activity and the suspect residence to validate the warrant—even "when there is absolutely no indication of any wrongdoing occurring at that residence...." *United States v. Goward*, 188 F. App'x 355, 358–59 (6th Cir. 2006). In fact, we have even gone so far to determine the existence of "a nexus between a defendant's residence and illegal drug activity with *no facts* indicating that the defendant was dealing drugs from his residence." *McCoy*, 905 F.3d at 418 (emphasis added). Instead, we determined that a "defendant's record of past drug convictions coupled with recent, reliable evidence of drug activity" is sufficient to establish the nexus. *Id.*; *see also United States v. Miggins*, 302 F.3d 384, 393 (6th Cir. 2002) (finding probable cause existed to support search of defendant's residence based on affidavit's outlining of defendant's prior cocaine-related convictions coupled with officers' same-day observations of him signing for a package containing a large amount of cocaine delivered at someone else's residence).

*United States v. Sumlin*, 956 F.3d 879, 886–87 (6th Cir. 2020), *cert. denied,* 141 S.Ct. 605, 208 L. Ed. 2d 194 (2020) (warrant affidavit established probable cause to search drug dealer's residence).

Agent Wenker's Affidavit demonstrates a nexus between the evidence sought–evidence of drug trafficking–and the places to be searched–Target Residence 1 and Target Residence 2. Agent Wenker attests to Defendant's extensive criminal history, which includes drug trafficking, and that in his experience as an agent, drug dealers keep evidence of their drug trafficking at their residences. (Affidavit at ¶ 11, 34.) Agent Wenker explained Defendant's extensive criminal history, including arrests for violent crimes, carrying concealed weapons, and narcotics violations. (*Id.* at ¶¶ 11–13.) As previously detailed, informants whose reliability was corroborated observed drug trafficking at both Target Residence 1 and 2. Further, police

12

conducted surveillance to determine Defendant was residing at Target Residence 1 and frequently visiting Target Residence 2. *See Moore*, 661 F.3d at 314.

Lastly, Defendant argues that probable cause does not exist because time frames are missing from Agent Wenker's affidavit. Although not every informant's tips provided timelines, the Affidavit often included the date when information was provided. In addition, officers corroborated the tips with their recent investigation, including surveillance from October 2019 until January 27, 2020, the date the Affidavit was signed and the Search Warrants were authorized.

For the reasons set forth herein, the Court finds that Agent Wenker's Affidavit provides probable cause that Hill was engaged in drug trafficking. Further, the Affidavit demonstrates probable cause that a search of both Target Residence 1 and Target Residence 2 would reveal evidence of his drug trafficking activities.

### B. Denial of *Franks* Hearing

The Defendant previously requested a *Franks* hearing on the basis that the confidential informants cited in the Affidavit were unreliable. The Court denied his request as well as reconsideration of the issue. (February 11, 2021 Minute Entry; Doc. 53.) This section memorializes the Court's oral rulings.

An affidavit supporting a search warrant is presumed valid. *United States v. Fountain*, 643 F. App'x 543, 545 (6th Cir. 2016) (citing *Franks*, 438 U.S. at 171). A defendant is entitled to a *Franks* hearing if he makes a "substantial preliminary showing" that (1) the affiant knowingly or recklessly included a false statement in—or omitted material information from—the affidavit, and (2) the allegedly false statement or material omission "is necessary to the probable cause finding." *Id.* (citing *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 203)).

13

"The defendant has a 'heavy burden,' as he must 'point to specific false statements that he claims were made intentionally or with reckless disregard for the truth' and 'accompany his allegations with an offer of proof.'" *Id.* (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "Only after the defendant makes this showing may the court consider the veracity of the statements in the affidavit or the potential effect of any omitted information." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019) (alterations in original) (citing *United States v. Archibald*, 685 F.3d 553, 558–59 (6th Cir. 2012)).

As the Court previously found, the Defendant failed to offer evidence that Agent Wenker knowingly or recklessly included a false statement or material omission in his Affidavit supporting the Search Warrants for Target Residences 1 and 2. Courts previously rejected the argument that a defendant who contests the reliability of a confidential informant is entitled to a *Franks* hearing. In *United States v. Rodriguez-Suazo*, the defendant sought to attack the veracity of a confidential informant's statements by submitting his own affidavit, a showing that the Court held is "hardly the 'substantial preliminary showing' required under *Franks*." 346 F.3d 637, 648 (6th Cir. 2003) (citing *Franks*, 438 U.S. at 155). That Court found that even if the information in the search warrant was ultimately false, the defendant provided no evidence that the Affiant intentionally or recklessly misrepresented facts in order to secure the search warrant. *Id.* at 648. This case is no different.[7]

### C. Good Faith Exception Would Apply

Generally, evidence obtained in violation of the Fourth Amendment cannot be used in criminally prosecuting the victim of the illegal search and seizure. *Illinois v. Krull*, 480 U.S.

---

[7] Regardless, even if the Court struck erroneous facts from Agent Wenker's Affidavit, denial of the Franks hearing would still be appropriate. *See United States v. Mastromatteo,* 538 F.3d 535, 546 (6th Cir. 2008) (affirming denial of *Franks* hearing where, even striking erroneous facts, the affidavit still provided probable cause).

14

340, 347 (1987). In 1984, however, the Supreme Court "established a new objective inquiry limiting suppression to circumstances in which the benefits of police deterrence outweigh the heavy costs of excluding 'inherently trustworthy tangible evidence' from the jury's consideration." *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).

Pursuant to this good faith exception, evidence "obtained in objectively reasonable reliance" on a "subsequently invalidated search warrant" need not be suppressed where an officer acts in good faith reliance on the warrant. *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (quoting *Leon*, 468 U.S. at 922). The Supreme Court, in *Leon*, identified four situations in which an officer's reliance cannot be considered "objectively reasonable:" (1) when the warrant is issued on the basis of an affidavit that an affiant knows—or is reckless in not knowing—contains false information; (2) when the issuing magistrate abandons his or her neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*, 468 U.S. at 914–23). Thus, if one of these situations applies, the evidence must be suppressed even if officers executing the warrant believed it to be valid.

In the case at bar, officers searching Target Residences 1 and 2 relied in good faith on the judicially approved Search Warrants. Having determined above that the Search Warrants were not based on information Agent Wenker knew or recklessly failed to know was false, the Court must now decide "whether the affidavit is 'so lacking in indicia of probable cause as to render

15

official belief in its existence entirely unreasonable.'" *United States v. Ward*, 967 F.3d 550, 554 (6th Cir. 2020) (quoting *Leon*, 468 U.S. at 923).

Affidavits "so lacking in indicia of probable cause" are commonly called "bare bones" affidavits. *Id.* (quoting *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017)). "To elude the 'bare bones' label, the affidavit must state more than 'suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge' and make '*some* connection' between the illegal activity and the place to be searched." *Id.* (quoting *United States v. Christian*, 925 F.3d 305, 312–13 (6th Cir. 2019) (en banc)) (emphasis in original). The Court must "read the affidavit holistically and examine the totality of the circumstances in making this inquiry." *Id.*

"We must take care not to confuse a bare bones affidavit with one that merely lacks probable cause." *Gilbert*, 952 F.3d at 763. As the Sixth Circuit recently explained:

> There must be daylight between the "bare bones" and "substantial basis" standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function. *See Leon*, 468 U.S. at 906–07, 913–21, 104 S.Ct. 3405; *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc). Thus, "[a]n affidavit cannot be labeled 'bare bones' simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding; rather, it must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." *White*, 874 F.3d at 497.

*Id.* (emphasis in original).

The objective reasonableness determination "inquires 'whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] decision'" to the contrary. *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) (quoting *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003)). "[R]easonable inferences that are not sufficient to

16

sustain probable cause in the first place may suffice to save the ensuing search as objectively reasonable." *United States v. Merriweather*, 728 F. App'x 498, 505 (6th Cir. 2018) (quoting *White*, 874 F.3d at 500.)

Agent Wenker's Affidavit is far from bare bones. It is a detailed, sixteen-page summary of an extensive investigation into drug trafficking activities by the Defendant based on interviews with a dozen confidential informants, police surveillance, and the Defendant's criminal history. This Affidavit contains enough factual support that a reasonably well-trained officer "would not know to disregard a judicial determination that probable cause existed." *Gilbert*, 952 F.3d at 761. Accordingly, even if the Court found probable cause to be lacking, the good faith exception would apply, and the evidence would not be suppressed.

### III. CONCLUSION

For the reasons set forth herein, the Court **DENIES** Defendant's Motion to Suppress Evidence and for *Franks* Hearing regarding evidence seized pursuant to the two Search Warrants of Target Residences 1 and 2 (Doc. 48).

**IT IS SO ORDERED.**

Judge Susan J. Dlott
United States District Court